# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| EVAN NG,<br><br>      Plaintiff,<br><br>v.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF MINNESOTA; MARK COYLE in his official capacity as Director of Athletics for the UNIVERSITY OF MINNESOTA; and JOAN T.A. GABLE in her official capacity as President of the UNIVERSITY OF MINNESOTA,<br><br>      Defendants. | Case No. 21-cv-2404<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. Evan Ng has been a competitive gymnast since he was six years old. For over thirteen years, Evan never took more than a few days off from training. Ng family vacations even centered around travel to gymnastics meets.

2. Evan's hard work and sacrifice were rewarded: he earned a scholarship to the University of Minnesota as a member of the University's highly ranked varsity men's gymnastics team. He was one of two incoming freshmen on the men's gymnastics team for the 2020–21 school year.

3. But before Evan ever set foot on campus, his elite gymnastics career was unceremoniously cancelled when the University abruptly announced on September 10, 2020, that it was eliminating its men's gymnastics team at the conclusion of the 2020–21 school year.

4. The University did not cut the team because it was unsuccessful—in its 118-year history, the team won twenty-one Big 10 Championships, produced two NCAA all-around champions, and recently sent an athlete to the Tokyo 2020 Olympics held in the summer of 2021.

5. The team was not eliminated because its members were bad students—in the spring 2021 semester, the men's gymnastics team had the highest GPA of any sport at the University, with five members earning 4.0s.

6. The team was not eliminated because it was too expensive—its estimated $750,000 annual budget is just a fraction of the athletic department's approximately $125 million annual budget, and the team has a privately-funded endowment of around $900,000.

7. Instead, the team was eliminated because the University's leadership claimed that compliance with Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), required it to maintain a ratio of male and female athletes in parity (or "proportional") with the University's undergraduate enrollment. In other words, the men's gymnastics team was cut

because the University sought to reduce the number of male athletes in its varsity athletics program.

8.     As a result, Evan Ng is no longer a varsity NCAA gymnast at the University of Minnesota solely because of his sex.

9.     Defendants the Board of Regents of the University of Minnesota, together with top-level administrators, including Director of Athletics Mark Coyle and University President Joan Gable, eliminated the men's gymnastics team in a misguided, unlawful, and unconstitutional attempt to comply with Title IX.

10.    The right to equal protection of the laws and to be free from discrimination on the basis of sex is guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. Title IX likewise prohibits discrimination on the basis of sex in any program that receives federal financial assistance. Because the University's elimination of the men's gymnastics team overtly discriminates on the basis of sex, it violates both the Fourteenth Amendment and Title IX.

## JURISDICTION AND VENUE

11.    This action arises under (1) the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, and (2) Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. This Court has jurisdiction over these federal claims under 28 U.S.C. §§ 1331 (federal

question) and 1343(a) (redress for deprivation of civil rights). Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

12. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) on the grounds that a substantial part of the acts giving rise to Plaintiff's claims occurred in Minnesota.

## PARTIES

13. Plaintiff Evan Ng, a native of Chicago, Illinois, is a sophomore at the University of Minnesota for the 2021–22 school year.

14. During the 2020–2021 school year, Evan competed as a freshman on the University's varsity men's gymnastics team. But for the decision to eliminate the men's gymnastics team, Evan would still be competing as a varsity NCAA athlete for the University throughout his three remaining years of regular eligibility, plus one additional year of eligibility granted by the NCAA due to COVID-19 disruptions.

15. Defendant Board of Regents of the University of Minnesota is the University's governing body and "body corporate . . . with the right as such, of suing and being sued." Minn. Laws 1851, cl. 3, § 7; *see also Miller v. Chou*, 257 N.W.2d 277, 278 (Minn. 1977). The Board of Regents consists of twelve members elected pursuant to Minn. Stat. § 137.0246. The Board is sued pursuant to *Ex parte Young*, 209 U.S. 123 (1908), for acting under color of state law in making determinations as to which varsity athletics programs are

4

maintained at the University. *See Issaenko v. Univ. of Minn.*, 57 F. Supp. 3d 985, 1011 (D. Minn. 2014).

16. Defendant Mark Coyle is the Director of Athletics for the University of Minnesota. Until it was eliminated in April 2021, the men's gymnastics team fell under Director Coyle's purview as Director of Athletics. He is sued in his official capacity pursuant to *Ex parte Young*.

17. Defendant Joan T.A. Gable is the President of the University of Minnesota. She is sued in her official capacity pursuant to *Ex parte Young*.

## FACTUAL ALLEGATIONS

### *A "sport like no other" and a legendary team*

18. Evan Ng has been a competitive gymnast since he was six years old. He loves the competition, travel, and camaraderie that comes with competing in men's gymnastics. Evan describes gymnastics as a "sport like no other."

19. After competing at the state and national levels throughout his childhood and teenage years, Evan was recruited by several universities. Turning down a more generous scholarship offer from another school, Evan chose to attend the University of Minnesota because of his trust in head coach Mike Burns and the elite program at the University.

20. Coach Burns was the sixth head coach in the team's 118-year history. A collegiate level coach for 34 years, Coach Burns led the University's men's gymnastics team to sixteen NCAA tournament appearances.

### *The men's gymnastics team was eliminated to reach statistical parity between men and women*

21. On September 10, 2020, before he even arrived on campus, Evan was instructed to join a Zoom call concerning the gymnastics team. On that call, Defendant Director of Athletics Mark Coyle announced that he was proposing to the Board of Regents that the men's gymnastics team be eliminated at the end of the 2020–21 school year.

22. Defendant Coyle also announced that day that the men's tennis and indoor and outdoor track and field teams were going to be eliminated as well. No women's teams were offered for elimination. Ultimately, men's outdoor track and field was retained.

23. During the September 10th call, Defendant Coyle initially alluded to financial concerns due to projected revenue shortfalls from the feared cancellation of fall sports in 2020 because of the COVID-19 pandemic. At the time, the projected athletics budget shortfall was $45 million to $65 million.

24. In reality, the University's athletics budget shortfall was significantly less than the University anticipated in September. Many fall sports were merely delayed by pandemic concerns, but not entirely cancelled.

6

25. When the University's athletics budget shortfall was found to be significantly less than anticipated, the University did not reverse its decision to eliminate men's gymnastics, tennis, or indoor track and field.

26. In total, cutting the men's gymnastics, tennis, and indoor track and field teams only pared an estimated $1.6 million from the athletic department's budget.

27. The primary reason cited for eliminating the men's teams by Defendant Coyle during the September 10th call was the University's perceived need to align its ratio of male athletes with the ratio of male undergraduates under University administrators' understanding of Title IX. By way of example, if 45% of the University's undergraduates were male, then it would seek to have no more than 45% of its varsity athletes also be male.

28. During two subsequent Board of Regents meetings on September 11 and October 9, 2020, Defendant Coyle and several members of the Board of Regents specifically referenced Title IX and statistical proportionality concerns as the reason for needing to eliminate men's sports teams. This erroneous interpretation of Title IX's requirements led the Board of Regents to vote to eliminate the men's gymnastics team on October 9, 2020.

29. After the Board of Regents' vote, Coach Burns and a group of alumni and supporters of the men's gymnastics team organized to form the Friends of Minnesota Men's Gymnastics. The Friends were organized to

7

attempt to reverse the Regents' decision and save men's gymnastics at the University.

30. In April 2021, the Friends presented a self-funding proposal to maintain the men's gymnastics program as a varsity University team through private sources, in addition to the existing program endowment. The Friends' proposal showed sufficient funding to maintain the men's gymnastics team for two seasons.

31. Despite this offer, the Chair of the Board of Regents and Defendant Gable wrote to the Friends confirming that Title IX, not financial need, was the reason for the decision to eliminate the men's gymnastics team.

32. In that letter, the Chair and Defendant Gable wrote that "[p]andemic finances certainly brought the question to the fore, but we have emphasized that the decision rests on much more than the financial. Title IX found us needing to not only pare down our men's sport offerings, but also to better manage our women's sport rosters . . . ."

33. As a result of the eliminated men's teams, including gymnastics, the Chair and Defendant Gable noted that the University will be "at parity with our enrollment numbers for the 2021–2022 academic year."

34. In a final effort to save the men's gymnastics team, the Friends requested a three-year delay to the decision to eliminate the team. In response, the Chair of the Board of Regents rejected the proposal outright in May 2021,

and responded that "the Title IX concerns based upon current enrollments need immediate attention and cannot be passed over in the hope that enrollments shift in the future."

### *The elimination of men's gymnastics prevents Evan from pursuing his gymnastics goals*

35. Evan's opportunity to compete as an NCAA varsity gymnast was prematurely eliminated along with the University of Minnesota's men's gymnastics team.

36. With the University's men's gymnastics team eliminated, only 13 NCAA Division I men's gymnastics teams remain, out of a total of 351 NCAA Division I schools.

37. If Evan were to attempt to transfer, only a handful of roster spots exist for male gymnasts at other universities.

38. Evan's transfer opportunities were further limited due to his recovery from a shoulder injury incurred prior to the 2020-21 season, and he was unable to fully showcase his abilities during the 2020-21 season because of his injury. Evan was limited to competing in pommel horse in just two competitions, and any chance he had for attracting potential transfer offers was resultingly slight.

39. Further constricting available transfer spots is the additional year of eligibility granted by the NCAA to compensate for time lost due to COVID-

19. Seniors who would otherwise have exhausted their eligibility during the 2020-21 school year are staying on for an additional year, taking up roster positions that could otherwise be available for transfer students.

40. Regardless of the potential for transfer offers that never came, Evan's first wish is to remain at the University of Minnesota and compete for the storied program he committed to out of high school. But despite his four remaining years of eligibility, Evan's NCAA gymnastics career has prematurely ended.

## CLAIMS FOR RELIEF
### (Against All Defendants)

### COUNT I
### Sex Discrimination in Violation of the
### Equal Protection Clause of the Fourteenth Amendment

41. Plaintiff incorporates and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint.

42. Due to Defendants' decision to eliminate the men's gymnastics team in order to achieve statistical parity on the basis of sex between the University's undergraduate enrollment and its athletics rosters, Plaintiff Evan Ng is no longer able to compete as a varsity NCAA gymnast for the University of Minnesota.

43. Defendants' decision to eliminate the men's gymnastics team discriminates against Plaintiff based on his sex.

10

44. Because Defendants' decision to eliminate the men's gymnastics team constitutes express sex discrimination, the decision is subject to "intermediate scrutiny." *See Craig v. Boren*, 429 U.S. 190, 197 (1976).

45. Under intermediate scrutiny, the Equal Protection Clause of the Fourteenth Amendment prohibits government from discriminating based on sex unless the reasons for doing so are substantially related to an important government objective. *Craig*, 429 U.S. at 197.

46. The burden of satisfying intermediate scrutiny falls on the government, *United States v. Virginia*, 518 U.S. 515, 533 (1996), whose rationales must be "exceedingly persuasive," *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982).

47. Defendants' decision to eliminate the men's gymnastics team in order to achieve statistical parity on the basis of sex between the University's general undergraduate enrollment and its athletic rosters does not further an important governmental objective because Title IX does not require or allow the use of quota-based discrimination on the basis of sex, *see* 20 U.S.C. § 1681(b). There is no important governmental objective in establishing sex-based quotas. *Cf. Taylor v. Teletype Corp.*, 648 F.2d 1129, 1133 (8th Cir. 1981) ("Numbers must be statistically significant before one can properly conclude that any apparent racial disparity results from some factor other than random chance.").

11

48. Defendants' decision to eliminate the men's gymnastics team to achieve financial savings of approximately $750,000 out of an approximate annual budget of $125 million does not further an important governmental objective because "'financial hardship is not a defense to a [probable] Title IX violation.'" *Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1102 (S.D. Iowa 2020) (quoting *Mayerova v. E. Michigan Univ.*, 346 F.Supp.3d 983, 998 (E.D. Mich. 2018)) (alteration in original).

49. Defendants' decision to eliminate the men's gymnastics team to achieve statistical parity on the basis of sex between the University's general undergraduate enrollment and its athletic rosters, is not substantially related to an important governmental objective because Title IX does not require statistical parity and there is no important government objective in establishing sex-based quotas.

50. Defendants' decision to eliminate the men's gymnastics team to achieve financial savings of approximately $750,000, is not substantially related to an important governmental objective. Saving 0.6 percent of the University's athletics budget is insufficient to justify discrimination on the basis of sex.

51. The University did not use any savings from the elimination of the men's gymnastics team to increase or secure athletic opportunities for women.

52. Plaintiff was denied his right to equal protection under the law in violation of the Fourteenth Amendment to the U.S. Constitution.

53. Because of Defendants' decision to eliminate the men's gymnastics team, Plaintiff suffers substantial and ongoing harm that cannot be remedied by money damages.

54. Defendants have denied Plaintiff the ability to participate as a varsity collegiate gymnast due to his sex without adequate justification.

55. Plaintiff will continue to suffer substantial and irreparable harm unless Defendants' discriminatory decision to eliminate the men's gymnastics team is declared unlawful and enjoined by this Court.

## COUNT II
### Sex Discrimination in Violation of
### Title IX of the Education Amendments of 1972

56. Plaintiff incorporates and re-alleges each and every allegation contained in paragraphs 1-40 of this Complaint.

57. In violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1981, *et seq.*, and the regulations and policies promulgated thereunder, *see* 34 C.F.R. § 106, *et seq.*, Defendants' decision to eliminate the men's gymnastics team discriminates against Plaintiff based on his sex by preventing him from participating as a varsity athlete for the University on the men's gymnastics team.

58. Title IX prohibits discrimination on the basis of sex in any education program or activity that receives federal financial assistance. 20 U.S.C. § 1681(a).

59. Defendants receive federal financial assistance.

60. Defendants' varsity athletic programs are programs or activities within which Title IX prohibits discrimination on the basis of sex.

61. Defendants eliminated the men's gymnastics team to reach statistical parity between the ratio of male and female athletes and the general undergraduate enrollment at the University.

62. Defendants' decision runs counter to Title IX's admonition that the statute's command of equal treatment "shall [not] be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total numbers or percentage of persons of that sex participating in [athletics], in comparison with the total number or percentage of persons of that sex [enrolled in the university.]" 20 U.S.C. § 1681(b).

63. Therefore, cutting the men's gymnastics team in order to reach statistical parity between the ratio of male and female athletes and the general undergraduate enrollment at the University violates Title IX's rule that "[n]o person shall, on the basis of sex, be excluded from participation in . . . any

14

interscholastic, intercollegiate, club or intramural athletics offered by a recipient . . . ." 34 C.F.R. § 106.41(a).

64. With the men's gymnastics team eliminated due to the sex of its members, Plaintiff is no longer able to train or compete at the collegiate varsity level, nor does he have access to the coaching, facilities, equipment, healthcare, nutrition, sports training, and academic support afforded to varsity athletes at the University.

65. Accordingly, Plaintiff's interests and abilities in competing in men's gymnastics are no longer "fully and effectively accommodated" by the University. 34 C.F.R. §106.41(c).

66. Plaintiff suffers substantial and ongoing harm because in eliminating the men's gymnastics team, Defendants are treating him differently on the basis of sex without fully and effectively accommodating his interests and abilities.

67. Plaintiff has and will continue to suffer substantial and irreparable harm unless Defendants' discriminatory decision to eliminate the men's gymnastics team is declared unlawful and enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A. An entry of judgment declaring that the University's decision to eliminate the men's gymnastics team is unconstitutional to the extent that it

deprives Plaintiff of equal protection of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

B. An entry of judgment declaring that the University's decision to eliminate the men's gymnastics team violates Title IX of the Education Amendments of 1972;

C. An entry of a permanent injunction against Defendants prohibiting them from seeking statistical parity or proportionality between the ratio of male and female athletes at the University and the University's general undergraduate enrollment;

D. An entry of an order requiring Defendants to reinstate the men's gymnastics program as a varsity sport at the University;

E. An award of attorney fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

F. Any further relief as the Court may deem just, necessary, or proper.

Dated: October 29, 2021	 s/ Samuel W. Diehl
	Samuel W. Diehl (#388371)
	**CROSSCASTLE PLLC**
	333 Washington Avenue N.
	Ste 300-9078
	Minneapolis, MN 55401
	T: (612) 429-8100
	F: (612) 234-4766
	E: sam.diehl@crosscastle.com

	and

	Caleb R. Trotter (Cal. #305195)*
	Erin E. Wilcox (Cal. #337427)*
	**PACIFIC LEGAL FOUNDATION**
	555 Capitol Mall, Suite 1290
	Sacramento, CA 95814
	Telephone: (916) 419-7111
	Email: CTrotter@pacificlegal.org
	Email: EWilcox@pacificlegal.org
	***Pro Hac Vice Applications filed herewith*

	**Attorneys for Plaintiff Evan Ng**

4861-0273-1265, v. 5