UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Evan Ng, | Case No. 21-cv-2404 SRN/BRT |
| Plaintiff, | |
| vs. | **MEMORANDUM OF LAW** |
| Board of Regents of the University of Minnesota; Mark Coyle in his official capacity as Director of Athletics for the University of Minnesota; and Joan T.A. Gable in her official capacity as President of the University of Minnesota, | **IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

Defendants Regents of the University of Minnesota (named in the caption as "Board of Regents of the University of Minnesota" and hereinafter the "University"), University Athletics Director Mark Coyle, and University President Joan T.A. Gabel (hereinafter the "University") respectfully move this Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Evan Ng's Complaint with prejudice.

## INTRODUCTION

This matter arises from the elimination of the University's varsity Men's Gymnastics team (the "Team"). Ng is a University student and a former Team member. He claims the Team's elimination violated Title IX and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

Ng's Title IX claim against Gabel and Coyle fails because it is not legally available against individual school officials. As to all Defendants, the same Title IX claim raised by Ng has already been reviewed and rejected by the U.S. Court of Appeals for the Eighth Circuit and other courts. Those decisions compel the dismissal of Ng's Title IX claim.

Ng's Equal Protection claim against the University is barred by immunity. As to all Defendants, the same claim has been reviewed and rejected by other courts. In short, on each count, Ng has failed to state a claim. Defendants therefore respectfully ask this Court to grant their motion to dismiss Ng's complaint with prejudice and in its entirety.

## STATEMENT OF FACTS

The University of Minnesota is a public higher education institution established by the Territorial Laws of the State of Minnesota and perpetuated by the Minnesota Constitution as a constitutional corporation. Minn. Terr. Laws, ch. 3, §§ 4, 7, 9 (1851); Minn. Const. art. XIII, sec. 3. The Board of Regents of the University of Minnesota ("Board of Regents" or "Board") is the University's governing body. (Complaint ¶ 15) Joan T.A. Gabel is the University's President. (Complaint ¶ 17) Mark Coyle is the University's Director of Athletics. (Complaint ¶ 16)

The University maintained a Men's Gymnastics Team as part of the varsity athletics program at its Twin Cities campus (the "Program"). (Complaint ¶¶ 2-4) Evan Ng was one of two incoming freshmen on the Team for the 2020-2021 school year. (Complaint ¶ 2)

On September 10, 2020, the University announced that it was eliminating the Team at the conclusion of the 2020-2021 school year along with the Men's Tennis and Men's Indoor Track teams. (Complaint ¶¶ 3, 22) The University eliminated the teams to facilitate

compliance with Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a)

("Title IX"), by ensuring parity or proportionality between the ratio of female and male

students in its undergraduate enrollment and the ratio of female and male athletics

participation opportunities provided by the Program.  (Complaint ¶¶ 7, 9, 25, 28, 33)[1]

According to the University, the three teams were also eliminated to reduce the

Program's budget.  (Complaint ¶¶ 23)  The Program's annual budget was approximately

$125 million per year.  (Complaint ¶ 6)  The combined budgets of the three teams was

approximately $1.6 million per year.  (Complaint ¶ 26)

## LEGAL STANDARD

As this Court well knows, a complaint must be dismissed if it fails to state a claim

upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6)

motion to dismiss, the complaint must include sufficient factual allegations to provide the

grounds on which the claim rests." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th

Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[F]acts alleged

must be enough to raise a right to relief above the speculative level and must state a claim

to relief that is plausible on its face." *Id.* (internal quotation marks and citation omitted).

Although the Court "must take all of the factual allegations in the complaint as true,"

it is "not bound to accept as true a legal conclusion couched as a factual allegation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

A "court considering a motion to dismiss can choose to begin by identifying pleadings that,

---

[1]   The University concedes that it receives federal education funding and is therefore
subject to the requirements of Title IX.

because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility,'" and it must therefore be dismissed. *Id.* (quoting *Twombly*, 550 U.S. at 557).

A court must dismiss an action if it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3). Sovereign immunity is a jurisdictional issue. *Hagen v. Sisseton-Wahpeton Comm. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000). In determining whether a court has subject-matter jurisdiction, it "restricts itself to the face of the pleadings, and the nonmoving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).

## ARGUMENT

### I.   Ng's Title IX claims must be dismissed.

#### A.   Against Gabel and Coyle

Ng's Title IX claim against Gabel and Coyle is not legally viable. "Title IX reaches institutions and programs that receive federal funds, 20 U.S.C. § 1681(a), . . . but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009); *see also Jenkins v. University of Minnesota*, 131 F.Supp.3d 860, 878 (D. Minn. 2015), *citing*

4

*Cox v. Sugg*, 484 F.3d 1062, 1066 (8th Cir. 2007). Because Title IX claims against school officials like Gabel and Coyle are not authorized, Ng's Title IX claim against Gabel and Coyle must be dismissed.

### B. Ng's Title IX claims fails as a matter of law.

Further, as to all Defendants, Ng's Title IX claim has been rejected by the courts. Ng claims the University's decision to eliminate the Team to provide parity or proportionality in athletics participation opportunities constitutes an unlawful gender based quota. (Complaint ¶¶ 47, 49, 61, 63) However, the U.S. Department of Education, the federal agency charged with enforcing Title IX, has specifically identified substantial proportionality as a prescribed means for demonstrating Title IX compliance. The Eighth Circuit and other courts have likewise affirmed the use of substantial proportionality to demonstrate Title IX compliance and have rejected the very claim raised by Ng.

In *Chalenor v. University of North Dakota*, 291 F.3d 1042 (8th Cir. 2002), the University of North Dakota eliminated its men's wrestling team in response to budgetary concerns and to reduce inequality in participation opportunities between female and male student-athletes. *Chalenor*, 291 F.3d at 1043. Like Ng here, the plaintiffs in *Chalenor* claimed the team elimination was analogous to the implementation of a gender-based quota system, which violated their rights under Title IX. *Id*.

Because the Eighth Circuit's analysis in *Chalenor* applies so directly, it is quoted here at length:

> Title IX prohibits educational institutions that receive federal financial support from engaging in sex-based discrimination. It states, in relevant part: "No person in the United States shall,

on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Pursuant to the statute, the former Department of Health, Education, and Welfare (HEW) and its successor departments, the Department of Health and Human Services (HHS) and the Department of Education, promulgated regulations implementing the statute. *See Cohen v. Brown Univ.*, 991 F.2d 888, 894–95 (1st Cir. 1993) (explaining transformation of agency and resulting duplicative regulatory oversight). The regulations provide, in part, as follows:

> (a) *General.* No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.
> ...
>
> (c) *Equal opportunity.* A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide *equal athletic opportunity* for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:
>
> > (1) Whether the selection of sports and levels of competition *effectively accommodate* the interests and abilities of members of both sexes ....

34 C.F.R. § 106.41 (2000) (Department of Education regulations) (emphasis added); *see also* 45 C.F.R. § 86.41 (2000) (identical HHS regulations).

To provide a clearer interpretation of what it meant by effective accommodation, HEW promulgated a policy interpretation "to

6

provide a framework within which the complaints can be resolved, and to provide institutions of higher education with guidance on the requirements for compliance with Title IX in intercollegiate athletic programs." 44 Fed. Reg. 71413 (1979). This interpretation requires an athletic program to meet one of three standards to accommodate effectively the interests and abilities of members of both sexes so as to comply with Title IX:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. 71418 (1979).

On January 16, 1996, the Department of Education issued a clarification memorandum to provide further guidance regarding its policy interpretation. It stated:

> [T]he three-part test furnishes an institution with three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics. If an institution has met any part of the three-part test,

> [the Department's Office for Civil Rights] will
> determine that the institution is meeting this
> requirement.

> Department of Education, Office for Civil Rights, Clarification
> of Intercollegiate Athletics Policy Guidance: The Three–Part
> Test (Jan. 16, 1996).

> The Department's letter transmitting the memorandum further
> explained that "an institution can choose which part of the test
> it plans to meet." Letter from Norma V. Cantú, Assistant
> Secretary for Civil Rights, Department of Education (Jan. 16,
> 1996). Compliance with the first prong of the test "affords an
> institution a 'safe harbor' for establishing that it provides
> nondiscriminatory participation opportunities." *Id.* The letter
> goes on to state that limiting men's teams in pursuit of
> equalizing athletic opportunities between the sexes is
> consistent with Title IX. "An institution can choose to
> eliminate or cap teams as a way of complying with part one of
> the three-part test." *Id.*

*Chalenor*, 291 F.3d at 1044-46. The Eighth Circuit found that the policy interpretations of

Title IX, including the three-part test, were entitled to "controlling deference." *Id.* at 1047.

The defendant in *Chalenor* relied upon part one of the three-part test in making its

decision to eliminate a men's team. *Chalenor*, 291 F.3d at 1046. The plaintiffs argued that

even if the three-part test was entitled to deference, the defendant had not established that

it was required to engage in gender balancing. *Id.* at 1047. The defendant responded that

it did not claim that gender proportionality was required, only that it was permissible. *Id.*

The Eighth Circuit agreed, finding that,

> although Title IX does not require proportionality, the statute
> does not forbid it either. And the gender make-up of athletic
> participation is certainly relevant to a determination of whether
> a school is in compliance with Title IX. As the statute goes on
> to say: "[T]his subsection shall not be construed to prevent the
> consideration . . . of statistical evidence tending to show that

8

> such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex." [20 U.S.C. § 1681(b).]

*Id*. Citing multiple holdings from other federal circuits, the Eighth Circuit confirmed that a university may bring itself into compliance with the equitable participation opportunity requirement of Title IX by increasing opportunities for the underrepresented gender, or by decreasing opportunities for the overrepresented gender, to attain substantial proportionality. *Id*. at 1048–49; *see also Boulahanis v. Bd. of Regents,* 198 F.3d 633, 638 (7th Cir.1999) (holding that a university's elimination of men's teams "is not a violation of Title IX as long as men's participation in athletics continues to be 'substantially proportionate' to their enrollment") (citation omitted), *cert. denied,* 530 U.S. 1284, 120 S.Ct. 2762, 147 L.Ed.2d 1022 (2000).[2]  This is what NG complains of here – that the University eliminated the Team to achieve parity in participation opportunities (*see* Complaint ¶ 47) – but the U.S. Department of Education has indicated, and the Eighth Circuit has already held that this is a permissible means of achieving Title IX compliance.

Also, like Ng here (*see* Complaint ¶¶ 6, 29, 30), the plaintiffs in *Chalenor* claimed the budgetary issues raised by the University of North Dakota were a red herring because private funding was available to support the wrestling program.  *Chalenor*, 291 F.3d at 1048.  The defendant in *Chalenor* noted that the private funding commitment was not

---

[2]  *Chalenor* cited *Boulahanis* with approval, 291 F.3d at 1049. *Boulahanis* was abrogated on unrelated grounds. *Trentadue v. Redmon*, 619 F.3d 648, 650 (7th Cir. 2010) (recognizing that Title IX was not an exclusive mechanism for addressing sex discrimination in schools).

certain.  *Id*.  The Eighth Circuit also noted that substituting private funding for public funding does not relieve a university of its obligation to comply with Title IX, i.e., a university must provide equitable participation opportunities for female and male student-athletes regardless of the source of funding for its programs.  *Id*.  Based on its analysis, the Eighth Circuit rejected the plaintiffs' arguments and affirmed summary judgment in favor of the defendant.  *Id*. at 1050.

Like the defendant in *Chalenor*, the University relied upon part one of the three-part test, the substantial proportionality part, to ensure Title IX compliance.  Like the plaintiffs in *Chalenor*, Ng asserts that the University's reliance on part one constituted an unlawful gender-based quota.  The Eighth Circuit specifically rejected that claim and validated the use of part one to achieve Title IX compliance.  *Chalenor* cited with approval[3] the Ninth Circuit's decision in *Neal v. Board of Trustees of California State University,* 198 F.3d 763, 769-70 (9th Cir.1999), which observed that "[e]very court, in construing the Policy Interpretation and the text of Title IX, has held that a university may bring itself into Title IX compliance by increasing athletic opportunities for the underrepresented gender (women in this case) *or* by decreasing athletic opportunities for the overrepresented gender (men in this case)."[4]

---

[3] *Chalenor*, 291 F.3d at 1048-49.

[4]  Other cases cited with approval on page 1049 of *Chalenor* include *Roberts v. Colorado State Board of Agriculture,* 998 F.2d 824, 830 (10th Cir.), *cert. denied,* 510 U.S. 1004, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993) ("Financially strapped institutions may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates become substantially proportionate to their representation in the undergraduate population."); and *Cohen v. Brown University,* 991 F.2d 888, 898 n.15 (1st

*Chalenor* confirms that the use of substantial proportionality to achieve Title IX compliance does not violate Title IX's nondiscrimination principle. Gender-conscious analysis, i.e., comparing/considering the numbers of female and male participation opportunities offered by a university, is unavoidable when evaluating substantial proportionality, and is not unlawful (discussed further in the next section). *Chalenor* is on point and compels the dismissal of Plaintiff's Title IX claim.

## II.    Ng's Equal Protection claim must be dismissed.

### A.    The University is not subject to suit under § 1983.

Ng brings his Equal Protection claim under 42 U.S.C. § 1983. (Complaint ¶ 11) Section 1983 imposes liability on any "person" who deprives another of constitutional rights. *See* 42 U.S.C. § 1983. It is well established that state entities are not "persons" under § 1983 and are therefore not subject to suit under the statute. *Will v. Michigan Department of State Police*, 491 U.S. 58, 64, 71 (1989). There can be no question that the University is a state entity, not a "person," and therefore is not subject to suit under § 1983. *See Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996) (quoting *Will*, 491 U.S. at 71). In *Treleven*, a University faculty member who had been denied tenure sued the University under § 1983, seeking reinstatement and monetary damages. *Id.* at 817. The U.S. Court of Appeals for the Eighth Circuit upheld the district court's grant of summary

---

Cir.1993) ("Title IX does not require that a school pour ever-increasing sums into its athletic establishment. If a university prefers to take another route, it can also bring itself into compliance by reducing opportunities for the overrepresented gender while keeping opportunities stable for the underrepresented gender (or reducing them to a much lesser extent).").

judgment to the University on the grounds that the University—a state entity—was not a "person" under § 1983. *Id.* at 818–19.

Ng cannot evade the University's immunity by suing "Board of Regents of the University of Minnesota." The Regents form a "body corporate" with the right to sue and be sued, and the members of the Board of Regents are "elected by the Legislature" to govern the University. Minn. Terr. Laws, ch. 3, §§ 4, 7, 9 (1851); *Star Tribune Co. v. Univ. of Minn. Bd. of Regents*, 683 N.W.2d 274, 280 (Minn. 2004) ("The Board of Regents is the governing body of the University of Minnesota."). An action against the Regents is an action against the University, and Minnesota's sovereign immunity applies and renders the Regents immune to the same extent as the University. *Humenansky v. Regents of Univ. of Minn.*, 152 F.3d 822, 824 (8th Cir. 1998) (affirming summary judgment for Regents of the University of Minnesota because the "University" is "an instrumentality of the state"); *Richmond v. Bd. of Regents of Univ. of Minn.*, 957 F.2d 595, 596 (8th Cir. 1992); *Issaenko v. Univ. of Minn.*, 57 F. Supp. 3d 985, 993 (D. Minn. 2014) (referring to the University and Regents as "collectively, 'the University'"); *Regents of Univ. of Minn. v. Raygor*, 620 N.W.2d 680, 681, 683 (Minn. 2001) (finding that "the University is an 'arm' of the State of Minnesota" entitled to sovereign immunity, where "University" is defined as "Regents of the University of Minnesota"). Because the University is not a person and is immune from suit under § 1983, Ng's Equal Protection claim against the University must be dismissed.

Moreover, the law is clear that the Eleventh Amendment to the U.S. Constitution immunizes the University from suit. *See id.* at 819 (holding, in the review of a grant of

12

summary judgment on a § 1983 claim, that "the District Court properly held that the University was an arm of the state and thus entitled to share in its Eleventh Amendment immunity").  "The Eleventh Amendment provides that states and their agencies are immune from suit in federal court, unless the state has consented to be sued, or Congress has abrogated the state's immunity by some express statutory provision." *Raymond v. Bd. of Regents of Univ. of Minn.*, 140 F. Supp. 3d 807, 813 (D. Minn. 2015).  Here, Ng has not alleged that Congress abrogated the University's immunity or that the University in any way has consented to this action—and in fact it has not done so.  Therefore, the University is not subject to suit in this Court under § 1983.

### B.     Ng's Equal Protection claim is an impermissible collateral attack on Title IX.

Regarding his Equal Protection claim as to all Defendants, Ng does not allege that Title IX, its regulations, or policy interpretations are unconstitutional.  Instead, he claims the Defendants denied him Equal Protection by basing the decision to eliminate the Men's Gymnastics team on gender.  (*See* Complaint ¶¶ 41-55)

The U.S. Court of Appeals for the Seventh Circuit considered the same argument in *Kelley v. Board of Trustees*, 35 F.3d 265 (1994).  The *Kelley* plaintiffs were members of the University of Illinois men's swimming team.  *Kelley*, 35 F.3d at 267.  They brought Title IX and Equal Protection claims after the university announced its decision to eliminate the team.  *Id*.  In dismissing the Equal Protection claim, the Seventh Circuit wrote,

> Plaintiffs' final argument is that the defendants' decision to
> eliminate the men's swimming program while retaining the

women's program denied them equal protection of law as guaranteed by the Fourteenth Amendment. We do not agree. First, the record makes clear that the University considered gender solely to ensure that its actions did not violate federal law. And insofar as the University actions were taken in an attempt to comply with the requirements of Title IX, plaintiffs' attack on those actions is merely a collateral attack on the statute and regulations and is therefore impermissible. *Milwaukee County Pavers Ass'n v. Fiedler*, 922 F.2d 419, 424 (7th Cir.1991), certiorari denied, 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 714 (1991).

*Kelley*, 35 F.3d at 272; *see also Miami University Wrestling Club v. Miami University*, 302 F.3d 608, 613–14 (6th Cir. 2002) (dismissing the Equal Protection claim brought by male student-athletes whose teams were eliminated because the claim was merely an impermissible attack on the constitutionality of Title IX, its regulations, and policy interpretations).

Ng acknowledges here that the University's actions in this case were taken to achieve its stated desire to comply with Title IX by ensuring equitable participation opportunities for women and men in the Program.  (Complaint ¶¶ 7, 27, 28, 33, 34, 42, 61) As such, Ng's Equal Protection claim is merely an impermissible collateral attack on the constitutionality of Title IX, its regulations, and policy interpretations.  For the reasons set forth in *Kelley*, Ng's Equal Protection claim must be dismissed.

c.    **Constitutional Analysis**

Further, the constitutional analysis of Ng's claim shows no Equal Protection violation.  In *Cohen v. Brown University*, 101 F.3d 155 (1st Cir. 1996),[5] the U.S. Court of

---

[5]   Defendants will refer to this decision as "*Cohen II*" to distinguish it from the earlier *Cohen* decision cited above.

Appeals for the First Circuit addressed the same Equal Protection claim raised by Ng here. The plaintiffs in *Cohen II* were a class of present and future women who sought to participate in intercollegiate athletics funded by the defendant. *Id*. at 161.  The defendant challenged a district court remedial order directing the defendant to comply with the Title IX three-part test.  Like Ng here, the defendant in *Cohen II* argued that the court's order violated the constitutional principle of Equal Protection because it involved the "imposition of quotas, preferential treatment, and disparate treatment in the absence of a compelling state interest."  *Id*. at 181.

In rejecting the defendant's Equal Protection claim, the First Circuit noted that Title IX is an anti-discrimination statute, not an affirmative action statute.  *Cohen II*, 101 F.3d at 170.  The First Circuit wrote,

> [f]rom the mere fact that a remedy flowing from a judicial determination of discrimination is gender-conscious, it does not follow that the remedy constitutes "affirmative action." Nor does a "reverse discrimination" claim arise every time an anti-discrimination statute is enforced. While some gender-conscious relief may adversely impact one gender[,] . . . that alone would not make the relief "affirmative action" or the consequence of that relief "reverse discrimination." To the contrary, race- and gender-conscious remedies are both appropriate and constitutionally permissible under a federal anti-discrimination regime, although such remedial measures are still subject to equal protection review.

*Id*. at 172.   The First Circuit's review of the defendant's Equal Protection claim applies equally to Ng's Equal Protection claim here:

Under intermediate scrutiny,[6] the burden of demonstrating an exceedingly persuasive justification for a government-imposed, gender-conscious classification is met by showing that the classification serves important governmental objectives, and that the means employed are substantially related to the achievement of those objectives. *E.g.*, *Hogan*, 458 U.S. at 724, 102 S. Ct. at 3336. Applying that test, it is clear that the district court's remedial order passes constitutional muster.

We find that the first part of the test is satisfied. The governmental objectives of "avoid[ing] the use of federal resources to support discriminatory practices," and "provid[ing] individual citizens effective protection against those practices," *Cannon,* 441 U.S. at 704, 99 S. Ct. at 1961, are clearly important objectives. We also find that judicial enforcement of federal anti-discrimination statutes is at least an important governmental objective.

Applying the second prong of the intermediate scrutiny test, we find that the means employed by the district court in fashioning relief for the statutory violation are clearly substantially related to these important objectives. Intermediate scrutiny does not require that there be no other way to accomplish the objectives, but even if that were the standard, it would be satisfied in the unique context presented by the application of Title IX to athletics.

As explained previously, Title IX as it applies to athletics is distinct from other anti-discrimination regimes in that it is impossible to determine compliance or to devise a remedy without counting and comparing opportunities with gender explicitly in mind. Even under the individual rights theory of

---

[6]   Should this matter proceed, the record will show that both male and female athletics participation opportunities were eliminated as part of the overall compliance plan that included the elimination of the Men's Gymnastics team, i.e., the plan did not simply target male student-athletes. As such, the University believes the rational basis standard applies, not the higher intermediate scrutiny standard. Because Ng's Complaint does not reference the female reductions, the Defendants only address the intermediate scrutiny standard here. As discussed, the University's actions meet that standard. However, the University reserves the right to raise the issue of the appropriate constitutional review standard, and discuss the rational basis standard, should the matter move forward.

equal protection, reaffirmed in *Adarand,* 515 U.S. at ——, 115 S. Ct. at 2112 (the equal protection guarantee "protect[s] persons, not groups"), the only way to determine whether the rights of an individual athlete have been violated and what relief is necessary to remedy the violation is to engage in an explicitly gender-conscious comparison. Accordingly, even assuming that the three-part test creates a gender classification that favors women, allowing consideration of gender in determining the remedy for a Title IX violation serves the important objective of "ensur[ing] that in instances where overall athletic opportunities decrease, the actual opportunities available to the underrepresented gender do not." *Kelley,* 35 F.3d at 272. In addition, a gender-conscious remedial scheme is constitutionally permissible if it directly protects the interests of the disproportionately burdened gender. *See Hogan,* 458 U.S. at 728, 102 S.Ct. at 3338 ("In limited circumstances, a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened.").

*Id*. at 183-185.

Like the district court's remedial order in *Cohen II*, the University's actions as alleged in the Complaint served important governmental objectives and employed means that were substantially related to the achievement of those objectives. The objectives included federal law (i.e., Title IX) compliance, avoiding the use of University resources to support discriminatory practices (i.e., lack of equity in athletics participation opportunities), providing individual student-athletes protection from such practices, and responsible management of public resources in the face of budget challenges. The means employed to implement the plan were directly related to the objectives, i.e., reducing male participation opportunities to ensure Title IX compliance through substantial

17

proportionality while at the same time achieving costs savings.[7]  As confirmed by *Cohen II*, intermediate scrutiny does not require that there was no other way to achieve the objectives.  A university is allowed to exercise its discretion in determining how to ensure compliance, including through the reduction of participation opportunities.

Because the University is not subject to suit under § 1983, and because the claim fails under the analysis set forth in *Kelley* and *Cohen II*, Ng's Equal Protection claim must be dismissed.

---

[7]  Plaintiff alleges that the financial savings from eliminating the Team was small relative to the Program's overall budget.  (Complaint ¶ 6)  While true, the Complaint also confirms that three teams were eliminated, and the total savings from that action were more significant.  (Complaint ¶ 26)  It is not improper for the University to seek to address budget concerns by making budget reductions in multiple areas that cumulatively seek to address the concerns.

## CONCLUSION

For the reasons stated above, the Defendants respectfully request that Ng's claims be dismissed with prejudice and in their entirety.


Dated:  January 4, 2022                    DOUGLAS R. PETERSON
                                           General Counsel
                                           University of Minnesota

                                           By s/ Brent P. Benrud
                                           Brent P. Benrud (#253194)
                                           Senior Associate General Counsel
                                           Timothy J. Pramas (# 240321)
                                           Senior Associate General Counsel
                                           Carrie Ryan Gallia (#0390479)
                                           Senior Associate General Counsel
                                           360 McNamara Alumni Center
                                           200 Oak Street S.E.
                                           Minneapolis, MN 55455
                                           (612) 624-4100
                                           benr0001@umn.edu
                                           pram0001@umn.edu
                                           ryang001@umn.edu

                                           Attorneys for Defendants