# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Evan Ng, | Case No. 21-cv-2404 (SRN/BRT) |
| Plaintiff, | |
| v. | **ORDER** |
| Board of Regents of the University of Minnesota, Mark Coyle *in his official capacity as Director of Athletics for the University of Minnesota*, and Joan T.A. Gable *in her official capacity as President of the University of Minnesota*, | |
| Defendants. | |

Caleb R. Trotter and Erin E. Wilcox, Pacific Legal Foundation, 555 Capitol Mall, Suite 1290, Sacramento, CA 95814; and Samuel W. Diehl, CrossCastle PLLC, 333 Washington Avenue North, Suite 300-907855401, Minneapolis, MN 55402, for Plaintiff.

Brent P. Benrud, Carrie R. Gallia, and Timothy J. Pramas, University of Minnesota Office of the General Counsel, 200 Oak Street Southeast, Suite 360, Minneapolis, MN 55455, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Plaintiff Evan Ng's Motion for Preliminary Injunction [Doc. No. 7]. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **DENIES** the motion.

## I.    BACKGROUND

### A.    The Parties

Plaintiff Ng, an Illinois native, is a sophomore at the University of Minnesota ("University") and a former member of the men's varsity gymnastics team. (Compl. [Doc. No. 1] ¶¶ 2, 8, 13.)

Defendant Board of Regents of the University of Minnesota (the "Board") is the University's governing body. (*Id.* ¶ 15.) It consists of twelve members who make decisions relating to the University, including "which varsity athletics programs are maintained at the University." (*Id.*)

Defendant Mark Coyle is the University's Athletic Director. (*Id.* ¶ 16.) Defendant Joan Gable is the University's President. (*Id.* ¶ 17.) Both are sued in their official capacities. (*Id.* ¶¶ 16–17.)

### B.    Factual Background

#### 1.    The University

The University is a co-educational, public institution that receives federal funding. (Defs.' Opp'n [Doc. No. 26] at 1, 3.) From 2016 to 2019, the number of female students, as a percentage of the total undergraduate enrollment, increased from 52% to 53.6%. (Declaration of Julie Manning [Doc. No. 27] ("Manning Decl.") ¶ 3.) Conversely, the percentage of males decreased from 48% to 46.4%. (*Id.*)

#### 2.    The Golden Gophers Athletics Program

The University supports a varsity intercollegiate athletics program, known as the Minnesota Golden Gophers athletics program ("Athletics Program"). (Declaration of

Mark J. Coyle [Doc. No. 29] ("Coyle Decl.") ¶ 1.)  This program is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88 ("Title IX") because the University receives federal funding.  (Defs.' Opp'n at 3.)

Athletic Director Coyle is assisted by Julie Manning, the Executive Associate Athletics Director, and Marc Ryan, a Senior Associate Athletics Director.  (Manning Decl. ¶ 1; Declaration of Marc Ryan [Doc. No. 28] ("Ryan Decl.") ¶ 1.)  Each year, the Athletics Program extends scholarship offers to prospective student-athletes.  (*See* Compl. ¶ 19.) Manning monitors and oversees the Athletics Program's compliance with Title IX. (Manning Decl. ¶ 2.)

### 3.   Investigation

In December of 2014, the U.S. Department of Education's Office for Civil Rights (the "OCR") began to investigate the Athletics Program's compliance with Title IX. (Coyle Decl. ¶ 3.)  By letter dated September 27, 2018, the OCR reported its findings to then University President Eric Kaler.  (*Id.*)

#### a.   The OCR's Investigation

The OCR's investigation focused on whether the University was providing equal athletic opportunities for members of both sexes based on data for the 2016–2017 academic year.  (*See generally* Coyle Decl. Ex. A ("OCR Findings") at 1–2, 2 n.2.)  At that time, the University had 25 men's and women's National Collegiate Athletic Association Division I sports teams, including men's gymnastics.  (*Id.* at 2.)

To determine whether the University was "providing equal participation opportunities" to members of each sex, the OCR applied a three-part test ("Three-Part Test"):

1. Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

2. Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of that sex; or

3. Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

(*Id.* at 4.) If the University complied with any one part of these requirements, it would have met its compliance obligation. (*Id.*).

The University claimed compliance with the first prong of the Three-Part Test. (*Id.*) To determine the University's compliance, the OCR examined the team rosters. (*Id.* at 5.) After compiling that data and comparing it to undergraduate enrollment data, the OCR issued its findings in a letter dated September 27, 2018. (*Id.* at 1–6; Coyle Decl. ¶ 3.)

## b.    The OCR's Findings

After compiling the data and comparing it to undergraduate enrollment data, the OCR found that "the University provided intercollegiate level participation opportunities for male and female students in numbers substantially proportionate to their enrollments." (OCR Findings at 1–6.) In reaching this conclusion, the OCR specifically relied on the following data:

4

| Sex | Athletic Participation Opportunities 2016–2017 | | Full-time Undergraduate Enrollment: 2016–2017 | |
|---|---|---|---|---|
| Men | 457 | 49.51% | 13,828 | 48.04% |
| Women | 466 | 50.49% | 14,955 | 51.96% |
| **Total** | **923** | | **28,283** | |

(*Id.* at 5.)  However, in comparing the "disparity between the enrollment rate of women (51.96%) and their intercollegiate athletic participation rate (50.49%)," 1.47 percentage points, the OCR explained that this meant that "28 additional female participation opportunities" were needed "to achieve proportionality."  (*Id.* at 6.)

Although proportionality is the goal, the OCR explained that the first prong of the Three-Part Test only requires that the opportunities for male and female students be "substantially proportionate," which occurs "when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team." (*Id.*)  Because the OCR calculated the University's average female team size to be 35.85 female athletes in the 2016–2017 academic year, a disparity of 28 did not reach that threshold.  (*Id.*)  Accordingly, the OCR concluded that the University complied with the first prong because it had achieved substantial proportionality.

### 4.    Plaintiff Chooses to Attend the University

In November 2019, Plaintiff committed to attend the University as a member of the men's varsity gymnastics team.  (Ryan Decl. ¶ 7; *see also* Ng Decl. ¶¶ 5.)  Competitive gymnastics has been at the center of Plaintiff's life since he was six years old.  (*See* Compl. ¶ 18.)  Throughout his childhood and teenage years, he traveled around the country, successfully competing in gymnastics competitions.  (*Id.* ¶ 19.)

Plaintiff's abilities and successes were noticed.  (*See id.*)  He was recruited by, and received scholarship offers from, multiple universities, including the University of Minnesota.  (*See id.*)  Given the University's elite program and his trust in former head coach Mike Burns, Plaintiff chose to attend the University, beginning in the 2020–2021 academic year.  (*Id.* ¶¶ 2, 19–20.)

### 5.    Covid-19 Pandemic

The Covid-19 pandemic significantly impacted the Athletics Program.  (*See* Coyle Decl. ¶ 9.)  In March 2020, the University cancelled all spring team competitions.  (*Id.*)  To prepare for the fall competitions, the Athletics Program incurred over five million dollars in unanticipated expenses to implement testing and disinfecting protocols, along with purchasing personal protective equipment and other supplies.  (*See id.* ¶¶ 9–10.)  Although these adjustments allowed fall competitions to proceed, they did so on a limited schedule and without any fans, decreasing revenue.  (*Id.* ¶ 9.)

Faced with these new circumstances, the Athletics Program estimated that it would incur losses between $45 and $65 million due to the Covid-19 pandemic during the 2020–2021 fiscal year. Given these anticipated losses, the Athletics Program "implemented a mandatory furlough/salary reduction program for all Program employees," along with laying-off employees and imposing a hiring freeze.  (*Id.* ¶ 12.)  In addition, many head coaches and administrative personnel "voluntarily agreed to even deeper salary cuts."  (*Id.*)

6.      **The Athletics Program Tracks Its Ongoing Compliance with Title IX**

During the same time, the Athletics Program continued to track its compliance with Title IX. (*See* Manning Decl. ¶¶ 2–5.) As the female undergraduate population continued to increase, the number of additional female participation opportunities needed for the Athletics Program to remain compliant under the first prong increased as well, as shown below:

| Academic Year | Number of Female Participation Opportunities Needed to be Substantially Proportional |
|---|---|
| 2016-2017 | 28 |
| 2017-2018 | 33 |
| 2018-2019 | 77 |
| 2019-2020 | 80 |

(*Id.* ¶¶ 4–5.) Given the growth in the number of female participation opportunities needed to remain compliant—which now exceeded the average female team size—the Athletics Program became gravely concerned that it had fallen out of compliance. (*See id.* ¶¶ 5–6; Coyle Decl. ¶¶ 4–5.) Accordingly, as fall 2020 approached, the Athletics Program discussed possible ways to remedy the situation.

The Athletics Program first considered creating women's lacrosse and field hockey teams. (Coyle Decl. ¶ 5.) It calculated that creating those teams would increase the annual budget by $3.5 million. (*Id.*) But with the expected financial losses from the Covid-19 pandemic, combined with pre-existing plans to reduce operating expenses, Coyle "concluded that the Program could not address the female underrepresentation in participation opportunities by adding new teams." (*Id.* ¶¶ 7, 11, 13.)

7

### a.      The Compliance Plan

In September 2020, the Athletics Program "developed a plan to ensure Title IX compliance and provide cost savings for the Program" (the "Compliance Plan").  (Manning Decl. ¶ 7; *see also* Coyle Decl. ¶ 14.)  The Compliance Plan sought to decrease the overall number of male and female participation opportunities to make them proportional to their respective representations in the undergraduate population.  (*See* Manning Decl. ¶ 7, Ex. A.)   Specifically, the Compliance Plan provided for the elimination of 118 male participation opportunities and 57 female participation opportunities.  (*Id.* ¶ 7.)  The plan achieved those decreases by eliminating "Men's Indoor Track and Field, Men's Outdoor Track and Field, Men's Tennis, and Men's Gymnastics," while not filling roster spots on women's teams vacated by graduating seniors.  (Coyle Decl. ¶ 14.)   The plan was developed with the policy goals of bringing the participation numbers as close to statistical parity as possible, to provide a cushion for the Athletics Program to address future fluctuations in the female/male undergraduate enrollment through roster management, and to minimize the chance that additional team elimination would be required in the foreseeable future.  (*Id.* ¶ 14.)  The Compliance Plan also required the University to honor scholarships for any student-athletes who chose to remain at the University after their team was eliminated.  (Manning Decl. ¶ 7.)  Overall, the Athletics Program calculated that these changes would result in about $1.6 million in annual costs reductions.  (Coyle Decl. ¶ 16.)

### b.      The Athletics Program Announces the Compliance Plan

The Athletics Program publicly announced the Compliance Plan in September 2020. (*Id.* ¶ 15.)  The gymnastics head coach, Michael Burns, and his two assistant coaches were

advised of the Compliance Plan at a meeting on September 10, 2020. (Declaration of Michael Burns [Doc. No. 11] ("Burns Decl.") ¶ 4.) The members of the men's varsity gymnastics team were advised later that same day. (*Id.* ¶ 9.)

The men's gymnastics coaches, along with the coaches for men's tennis and men's indoor and outdoor track, were informed by the Director of Athletics that the programs needed to be cut in response to projected financial losses related to the Covid-19 pandemic, and the University's "Title IX imbalance of proportionality of numbers." (*Id.* ¶ 5.) Coyle also shared that he would present the Compliance Plan to the Board the next day. (*Id.* ¶ 6.)

Coyle made the same announcement to the student-athletes. (*Id.* ¶ 9; *see also* Ng Decl. ¶ 6; Coyle Decl. ¶ 15.) This was an upsetting and disappointing moment for the athletes. (Burns Decl. ¶ 9; *see also* Ng Decl. ¶ 7.) The incoming freshmen, like Ng, had not yet arrived on campus, and already had to consider whether to transfer or see their collegiate athletics career come to an end. (*See* Ng. Decl. ¶¶ 6–7; *see also* Burns Decl. ¶ 14.)

Coyle presented the Compliance Plan to the Board the next day. (Coyle Decl. ¶ 15; Burns Decl. ¶¶ 15–16.) Before the Board voted on the plan in October, student-athletes, alumni, supporters, and coaches sought out ways to save the programs. (Burns Decl. ¶¶ 17–18.) In response, Coyle submitted an amended version of the Compliance Plan that no longer eliminated men's outdoor track and field. (*Id.* ¶ 19; Coyle Decl. ¶ 14.) In October, the Board approved the amended Compliance Plan by a vote of 7 to 5. (Burns Decl. ¶ 19.)

### 7.   The Response of the Men's Gymnastics Program

#### a.   The 2020–2021 Season

Although the elimination of their team was imminent, the 18-member men's varsity gymnastics team successfully competed during the 2020–2021 season.  (Burns Decl. ¶¶ 12–13, 22.)  Two of the athletes were recognized as national champions and eight were named All-American athletes.  (*Id.* ¶ 22.)  In addition, the team earned the highest grade point average during the spring semester of any team in the Athletics Program.

#### b.   The Friends of Minnesota Men's Gymnastics

In an effort to save the team, interested persons formed the Friends of Minnesota Men's Gymnastics (the "Friends"), registering it with the State of Minnesota and filing an application for non-profit status.  (Burns Decl. ¶ 23.)  The Friends met to discuss strategies for the future of men's gymnastics at the University, brainstorming ways to get it reinstated. (*Id.*; Declaration of Brian Meeker [Doc. No. 12] ("Meeker Decl.") ¶¶ 2, 4.)

The Friends developed a plan to privately fund the men's gymnastics program. (Meeker Decl. ¶¶ 5–6.)  The plan proposed a budget of $200,000, but also indicated that they had "flexibility with these proposed amounts." (*Id.* Ex. B at 1.)  The Athletics Program rejected this proposal, prompting the Friends to request that the University's decision be delayed for three years, to give the student-athletes, like Ng, the opportunity to "complete their NCAA collegiate athletic eligibility at the [University]." (*Id.* Exs. C, D.)  This request was also denied.  (*Id.* Ex. E.)

### 8.    The Elimination of the Men's Gymnastics Program

In April 2021, the men's varsity gymnastics team was eliminated.  (Ryan Decl. ¶ 2.)

The employment of one assistant coach ended in April 2021, while the other's employment

was terminated in May.  (Ryan Decl. ¶ 3.)   The University terminated Coach Burns'

employment in August 2021.  (*Id.*)

Prior to his termination, Burns worked diligently with other on-campus

organizations to create a club gymnastics program for the 2021–2022 school year.  (Burns

Decl. ¶¶ 24–26.)   Students took over leadership of that club program once Burns'

employment ended.  (*Id.* ¶ 30.)   The University also required the athletes to vacate their

locker room.  (*Id.* ¶ 31.)

### 9.    The Current Status of the Men's Gymnastics Team

Since the elimination of the program, eleven of the gymnasts have graduated.  (Ryan

Decl. ¶¶ 4–5.)  An additional gymnast left the University to pursue other opportunities, and

two transferred to other schools.  (*Id.* ¶ 4.)   Accordingly, only four former gymnasts

currently attend the University.  (*Id.* ¶ 9.)  Everyone agrees that the team is in no position

to compete during the 2021–2022 season.  (Burns Decl. ¶ 32; Ryan Decl. ¶ 11.)

### C.    Procedural History

Plaintiff filed the Complaint in the District of Minnesota on October 29, 2021,

alleging two causes of action.  (*See generally* Compl.)  Plaintiff brings an action for sex

discrimination under Title IX of the Education Amendments of 1972 and a Section 1983

action for violations of the Equal Protection Clause of the Fourteenth Amendment.  (*Id.*

¶¶ 41–67.)

11

Ten days later, Plaintiff filed this motion for preliminary injunction. Plaintiff requests that the Court "enjoin the University from maintaining its decision to cut men's gymnastics" and "restore the status quo by ordering the team reinstated during the pendency of this case." (Pl.'s Mem. [Doc. No. 9] at 2.) Defendants oppose the motion for preliminary injunction.

## II.   DISCUSSION

### A.   Legal Standard for Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In general, a court issues a preliminary injunction when "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). In making that decision, courts consider the following four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Id.* at 114. A plaintiff is "entitled to a preliminary injunction only if the [above] factors, on balance, weigh in [plaintiff]'s favor." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 499 (8th Cir. 2013). When applying these factors, "a court should flexibly weigh the case's particular circumstances." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (internal quotation marks and citation omitted). The burden of establishing the four factors lies with

the party seeking injunctive relief. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

### B.     Analysis

#### 1.     Irreparable Harm

To receive injunctive relief, the moving party must show that it faces "a sufficient threat of irreparable harm." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999).   Defendants do not dispute that Plaintiff suffers harm by losing his ability to compete in intercollegiate gymnastics.   (*See* Defs.' Opp'n at 33.)   Instead, Defendants contend that Plaintiff's 13-month delay in seeking a preliminary injunction shows that there is no threat of *irreparable* harm.   (*Id.* at 32–33.)   The Court agrees.

The purpose of granting an injunction is to "prevent such a change in the relations and conditions of persons and property as may result in irremediable injury to some of the parties before their claims can be investigated and adjudicated." *Love v. Atchison, T. & S. F. Ry. Co.*, 185 F. 321, 331 (8th Cir. 1911); *see also Dataphase*, 640 F.2d at 113 ("[T]he question is whether . . . justice requires the court to intervene to *preserve the status quo* until the merits are determined." (emphasis added)).   When a party delays in bringing a motion for a preliminary injunction until after conditions have changed, then the motion no longer seeks to preserve the status quo, but rather, seeks to change the status quo back to how things used to be. *See Cenveo Corp. v. S. Graphic Sys., Inc.*, Civ. No. 08-5521 (JRT/AJB), 2009 WL 161210, at *3 (D. Minn. Jan. 22, 2009) ("The status quo refers to the *existing* state of affairs, and preliminary injunctive relief cannot go back in time and recapture the status quo of an earlier time.").   For example, in *Cenveo*, the District of

Minnesota explained that it cannot require employees who have changed jobs to return to their old jobs.  *Id.*

Here, Plaintiff waited approximately 13 months to seek a preliminary injunction after learning about the University's decision to eliminate men's varsity gymnastics team.  (*See* Burns Decl. ¶ 9; Mot. Prelim. Inj.)  Over the course of those 13 months, much has changed.  Only four former gymnasts currently attend the University, while none of the coaches remain and no Big Ten schedule exists.  (Ryan Decl. ¶¶ 3, 9; Burns Decl. ¶ 32.)  Moreover, nothing in the record establishes that, even if the Court granted the preliminary injunction, the men's varsity gymnastics team could compete during the 2021–2022 season.  In fact, counsel conceded at oral argument that the team could not compete this year.  As such, Plaintiff's delay is significant.  *See McKinney ex rel. N.L.R.B. v. S. Bakeries, LLC*, 786 F.3d 1119, 1125 (8th Cir. 2015) (explaining that a "[d]elay is only significant if the harm has occurred and the parties cannot be returned to the status quo" (internal quotation marks and citation omitted)).

Despite this significant delay, Plaintiff asks the Court to "*restore the status quo* by ordering the team reinstated during the pendency of this case."  (Pl.'s Mem. at 2 (emphasis added).)  Whether a delay negates a finding of irreparable injury depends on whether the delay was reasonable, which "turns on the facts of each case."  *Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 936 (8th Cir. 2002).  Accordingly, the Court analyzes whether Plaintiff's delay was reasonable.

Plaintiff asserts that this delay was reasonable because he was attempting to resolve the matter without the need for litigation.  (*See* Pl.'s Reply [Doc. No. 31] at 3–4.)  Based

on the record before the Court, however, the efforts made to resolve this matter without litigation ended, at the latest, on May 7, 2021, when the University rejected the Friends' request to delay the elimination of the team.  (*See* Meeker Decl. Ex. E; *see also* Compl. ¶ 34.)  And yet Plaintiff delayed an additional six months before filing this motion seeking a preliminary injunction.

The Court finds this delay negates a finding of irreparable injury because the delay was not reasonable.  As of May 7, 2021, Plaintiff knew that the University would not change its position.  At that time, the head coach was still employed by the University, the team had not vacated the locker room, and time remained to recruit other gymnasts, create a Big Ten schedule, and prepare for the upcoming 2021–2022 season.  By the time this motion was filed, there was no longer any possibility that the status quo could be maintained.  *See, e.g.*, *Hubbard Feeds*, 182 F.3d at 602 (affirming district court's denial of request for a preliminary injunction in part because plaintiff's delay in asserting his rights "belies any claim of irreparable injury pending trial"); *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (affirming district court's denial of a preliminary injunction when plaintiff failed to seek relief "for a period of seventeen months"); *CHS, Inc. v. PetroNet, LLC*, Civ. No. 10-94 (RHK/FLN), 2010 WL 4721073, at *3 (D. Minn. Nov. 15, 2010) (finding no irreparable injury after a seven-month delay); *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*, Civ. No. 3:09-CV-00390-L, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009) (finding delay of five months to seek injunctive relief undermined claim of irreparable injury); *Cafferty v. Trans World Airlines, Inc.*, 488 F. Supp. 1076, 1080 (W.D. Mo. 1980) (holding that "[t]he clearest reason for denying the

injunction" is that a preliminary injunction would restore "a status quo which has been dead for more than a year prior to the filing of suit"); *cf. Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (holding delay to seek a stay unreasonable when petitioner waited maximum time to file a certiorari petition and waited until 20 days after filing the petition to seek the stay).

In an effort to persuade the Court that maintaining the status quo requires the Court to reinstate the men's varsity gymnastics team, Plaintiff points to *Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085 (S.D. Iowa 2020) *appeal dismissed*, No. 21-1203, 2021 WL 3174982 (8th Cir. Feb. 26, 2021).  But *Ohlensehlen* is clearly distinguishable.  There, the university made the decision to eliminate the women's swimming and diving team on August 21, 2020.  *Ohlensehlen*, 509 F. Supp. 3d at 1088.  The plaintiffs filed a motion for a preliminary injunction on December 3, 2020, less than three months later, which the court granted.  *Id.* at 1088, 1106.  At the time plaintiffs filed the motion for preliminary injunction, none of the student-athletes had left the university, and, although some had committed to transferring, "many of its members would remain if given the chance to reinstate the team." (*Id.* at 1093.)  And there is no mention in that case that the coaches had been fired or that the team would be unable to compete in the 2020–2021 season.

For these reasons, Plaintiff has failed to establish irreparable injury here, and, therefore, this factor weighs in favor of denying the preliminary injunction.

## 2.    Likelihood of Success on the Merits

Courts in the Eighth Circuit apply two slightly different standards when assessing a movant's probability of success on the merits.  *Planned Parenthood v. Rounds*, 530 F.3d

724, 730–33 (8th Cir.2008). The first standard, which applies in most cases, requires a movant to only show that he or she possesses a "fair chance of prevailing" on the merits, with a "fair chance" meaning something less than fifty percent. *Id.*; *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019). However, when the movant challenges the validity of a statute, then the second standard applies, which requires the movant to demonstrate that the probability of success is at least "likely," meaning greater than fifty percent. *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 974 (D. Minn. 2016).

Here, Plaintiff does not challenge the validity of any statute, either facially or applied. Instead, he alleges that the University's actions violate Title IX and the Equal Protection Clause of the Fourteenth Amendment. Therefore, to satisfy the probability-of-success-on-the-merits factor, Plaintiff needs only show that he has a "fair chance of prevailing" on one or both of his claims. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742–43 (8th Cir. 2002) (affirming grant of preliminary injunction after analyzing the likelihood-of-success factor on only one claim). Accordingly, the Court turns to each of the causes of action in the Complaint.

### a.    Gender Discrimination Claim under Title IX

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

The United States Department of Education interprets Title IX's provisions to extend to the athletics programs of institutions of higher education that accept federal funds.[1] 34 C.F.R. § 106.41.  It also interprets its regulations to permit collegiate-athletics departments three different means of complying with Title IX.   44 Fed. Reg. 71418 (outlining the Three-Part Test).  A university is Title IX compliant under the first prong only if the female-to-male ratio in its athletics program is "substantially proportionate" to the ratio in the student body.  *Id.*

Plaintiff argues that Defendants' elimination of the men's varsity gymnastics team was in clear violation of Title IX.  (Pl.'s Mem. at 29–32.)  Defendants respond that Plaintiff's arguments fail under *Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042 (8th Cir. 2002), which is binding precedent.  (Defs.' Opp'n at 16–22.)  The Court agrees that *Chalenor* is on point and binding on this Court.

---

[1]   Because Title IX applies to institutions and programs, "it has consistently been interpreted as not authorizing suit against school officials." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009); *cf. Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 611 (8th Cir. 1999) (joining those circuits holding that "school officials may not be sued in their individual capacity under Title IX" because they do not receive federal funds).  In addition, the Eighth Circuit has consistently held that "[a] suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity." *McKay v. City of St. Louis*, 960 F.3d 1094, 1102 (8th Cir. 2020) (quoting *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010)); *see also Doe v. Univ. of Ark. - Fayetteville*, 974 F.3d 858, 866 (8th Cir. 2020) ("An official-capacity claim is a claim against the institution.").  Such a claim is properly "dismissed as redundant if the employing entity is also named." *King v. City of Crestwood, Missouri*, 899 F.3d 643, 650 (8th Cir. 2018).  Accordingly, the Court concludes that Plaintiff does not have a fair chance of success against Coyle and Gable on the Title IX claims. *See Doe v. Bd. of Regents of Univ. of Nebraska*, 509 F. Supp. 3d 1133, 1139 (D. Neb. 2020) (granting motion to dismiss as to university officials).

In *Chalenor*, the Eighth Circuit held that the University of North Dakota did not violate Title IX when it eliminated the men's wrestling program. 291 F.3d at 1043, 1050. There, the university claimed that it faced gender-equity and budgetary issues, which led to the elimination of certain men's sports programs in order to achieve substantial proportionality under the first prong of the Three-Part Test. *Id.* at 1043, 1047. Plaintiffs alleged that the decision to eliminate the men's wrestling program was not made out of budgetary concerns because a private donor had offered to fund the program. *Id.* at 1043. Plaintiffs further argued that the university's decision violated Title IX because nothing required the university to rely only on the first prong of the Three-Part Test. *Id.* at 1047. The Eighth Circuit rejected those arguments, concluding that, "although Title IX does not require proportionality, the statute does not forbid it either," and explaining that "the gender make-up of athletic participation is certainly relevant to a determination of whether a school is in compliance with Title IX." *Id.* The court also noted that the private-funding argument did not change the analysis. *See id.* at 1048–49.

The factual circumstances here are essentially the same as in *Chalenor*. The University claims that budgetary and gender-equity issues lead to the Compliance Plan. As in *Chalenor*, Plaintiff asserts that the budgetary issues are pretextual because the Friends have offered to fund the program. Also, as in *Chalenor*, Plaintiff asserts that the University was not required to cut the men's varsity gymnastics team. But the Eighth Circuit has already rejected those arguments, and, therefore, there is not a fair chance of success on the merits of Plaintiff's Title IX claim.

To distinguish this case from *Chalenor*, Plaintiff asserts that the University was already substantially proportionate and, therefore, had no reason to cut the men's varsity gymnastics team.  (Pl.'s Reply at 13.)  Specifically, Plaintiff emphasizes that there was a gender disparity of only 3.88%, whereas the University of North Dakota in *Chalenor* faced a 13.5% disparity.  Plaintiff argues that a 3.88% disparity is simply insufficient to justify Defendants' actions, citing *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963 (D. Minn. 2016).  (*See* Pl.'s Reply at 10–11.)  But *Portz* does not help Plaintiff here.

In *Portz*, the district court recognized that "courts have not precisely determined how great the deviation need[s] to be before the ratios are no longer 'substantially proportionate.' "  196 F. Supp. 3d at 975.  The court noted, as Plaintiff points out, that usually athletic programs with disparities above 10% are not substantially proportionate, while those below 3.5% usually are sufficiently substantially proportionate.  *Id.*  But the court also made clear that, no matter the disparity percentage, the "question depends in part on the facts of the case."  *Id.* at 976.[2]

The facts of this case demonstrate that, under the OCR's metrics, the University concluded, in good faith, that it was no longer substantially proportionate.  To briefly review, the OCR based its findings on the Athletic Program's data for the 2016–2017 academic year.  (OCR Findings 2 n.2.)  For that year, the OCR calculated the female

---

[2]     Notably, the court cited *Biediger v. Quinnipiac Univ.*, 691 F.3d 85 (2nd Cir. 2012), which held that a disparity of 3.62% was not substantially proportionate.  *Portz*, 196 F. Supp. 3d at 975.  Here, Plaintiff concedes that the disparity percentage could be as high as 3.88%, which, under *Biediger*, is sufficient to find that the University was no longer substantially proportionate.

disparity to be 1.47 percentage points, explaining that this meant that the University needed "28 additional female participation opportunities . . . to achieve proportionality." (*Id.* at 6.)  The OCR further explained that, despite those 28 missing opportunities, the University was *substantially* proportionate under the first prong because "the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team." (*Id.*)  Because OCR calculated the average female team size to be 35.85 female athletes in the 2016–2017 academic year, a disparity of 28 did not reach that threshold. (*Id.*)

However, things changed after the 2016–2017 academic year.  Specifically, the number of female participation opportunities needed to achieve proportionality increased to 80, which was at least two times greater than the average 2016–2017 female team size. (*See* Manning Decl. ¶¶ 4–5.)  Simply put, the University had good reason to believe that it was no longer substantially proportionate, prompting the University to develop the Compliance Plan to ensure compliance with Title IX.  Accordingly, because *Chalenor* is binding precedent, the Court finds that Plaintiff does not have a fair chance of success on the Title IX claim at this time.

### b.  Section 1983 Claim for Gender Discrimination under the Equal Protection Clause

Plaintiff contends that the Defendants' decision to eliminate the men's varsity gymnastics team was a gender-based decision that fails to meet the intermediate scrutiny standard under the Fourteenth Amendment's Equal Protection Clause.  (Pl.'s Mem. at 17–29.)  Defendants contend that Plaintiff does not have a fair chance of success on this claim

because this is an impermissible collateral attack on Title IX and the claim fails on the merits. (*See* Defs.' Opp'n at 24–32.) Each argument is considered in turn.[3]

### (i)   A Collateral Attack on Title IX

Defendants assert that Plaintiff's equal protection claim is an impermissible collateral attack on Title IX. (Defs.' Mem. at 26–27.) The Court agrees.

Courts consider compliance with a law unconstitutional only when the law, its regulations, or the policy interpretations are unconstitutional. But Plaintiff makes clear that he is not alleging that Title IX is unconstitutional. Accordingly, Plaintiff's constitutional claim is an impermissible collateral attack on Title IX. *See Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 614, 616 (6th Cir. 2002) (holding that plaintiff's equal protection claim was an impermissible collateral attack on Title IX and

---

[3] Defendants also assert that Plaintiff does not have a fair chance of prevailing on his equal protection claim because the Board is immune from liability. (Def.'s Opp'n at 25–26.) "*Ex parte Young* recognized that suits may be brought in federal court against state officials in their official capacities for prospective injunctive relief to prevent future violations of federal law." *Fond du Lac Band of Chippewa Indians v. Carlson*, 68 F.3d 253, 255 (8th Cir. 1995). In determining whether this exception applies, a court conducts "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011) (internal citations omitted). Here, the Board of Regents was sued in their official capacities. (*See* Compl. ¶ 15.) Therefore, the Board is immune from liability as to money damages, but not as to prospective injunctive relief. *Raymond v. Bd. of Regents of Univ. of Minnesota*, 140 F. Supp. 3d 807, 814 (D. Minn. 2015), *aff'd sub nom.*, 847 F.3d 585 (8th Cir. 2017) (holding that immunity protects the board of regents from money damages, but not from injunctive relief).

Defendants also contend that the equal protection claim fails because the Board is not a "person" under 42 U.S.C. § 1983. (Defs.' Opp'n at 24–25.) Because the Court finds that Plaintiff's equal protection claim is unlikely to succeed on other grounds, it does not address this argument.

thus affirming summary judgment on that claim); *see also Kelley v. Bd. of Trustees*, 35 F.3d 265, 272 (7th Cir. 1994) (("[I]nsofar as the University actions were taken in an attempt to comply with the requirements of Title IX, plaintiffs' attack on those actions is merely a collateral attack on the statute."). Here, like in *Miami University Wrestling Club* and *Kelley*, Defendants acted in a good faith effort to comply with Title IX. To be clear, Title IX permits the University to use the first prong of the Three-Part Test to assess whether it is in compliance with Title IX. *See* 44 Fed. Reg. 71418 (Dec. 11, 1979) ("Compliance will be assessed in any *one* of the following ways . . . ." (emphasis added).).

### (ii)   The Merits of the Constitutional Claim

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. When a challenged policy discriminates on the basis of gender, "it is subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment." *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 723 (1982); *see also Cohen v. Brown Univ.*, 101 F.3d 155, 182 (1st Cir. 1996) ("Because the challenged classification is gender-based, it must be analyzed under the intermediate scrutiny test."). Pursuant to the intermediate scrutiny standard, "the reviewing court must determine whether the proffered justification is "exceedingly persuasive." *United States v. Virginia*, 518 U.S. 515, 533 (1996); *D.M. by Bao Xiong*, 917 F.3d at 1001. This burden is "demanding and it rests entirely on the State." *Id.* To justify a gender classification, the government actor must show "that the [challenged] classification serves important governmental objectives and that the

discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 533 (alteration in original) (internal quotation marks omitted).

The Court finds that the first part of the test is satisfied. Courts have held that "removing the legacy of sexual discrimination" is an important government objective. *Kelley*, 35 F.3d at 272; *cf. Califano v. Webster*, 430 U.S. 313, 317 (1977) ("Reduction of the disparity in economic condition[s] between men and women caused by the long history of discrimination against women has been recognized as [] an important governmental objective."). This is especially true in the context of "extra-curricular offerings such as athletics." *Id.* Courts have also found that the government objectives of "avoid[ing] the use of federal resources to support discriminatory practices," "provid[ing] individual citizens effective protection against those practices," and enforcing "federal anti-discrimination statutes" are important. *Cohen*, 101 F.3d at 184 (internal quotation marks omitted).

Here, the University's objectives were to "address the female underrepresentation in participation opportunities," "bring[] participation numbers as close to statistical parity as possible," "provide a cushion for the Program to address future fluctuations through roster management," minimize "the chance that the Program would have to consider additional team eliminations in the foreseeable future," and create "annual costs reductions for the Program." (Coyle Decl. ¶ 13–15; *see also* Burns Decl. ¶ 5; Def.'s Opp'n at 31.) As in *Kelley* and *Califano*, the Athletics Program seeks to remedy a long history of discrimination against women in collegiate athletics by addressing the underrepresentation in female participation opportunities. Similar to *Cohen*, the Athletics Program seeks to

enforce Title IX, a federal anti-discrimination statute.  Furthermore, as outlined in *Cohen*, by addressing the lack of female participation opportunities, the Athletics Program is protecting its female student-athletes from suffering discrimination and protecting public funds from supporting such discriminatory practices.  The Court finds these to be important government objectives.

The Court also finds that Defendants meet the second prong of the intermediate scrutiny test.  Remedial measures that consider gender in order to protect the interests of a disproportionately burdened gender satisfy the intermediate scrutiny test.  *Kelley*, 35 F.3d at 272; *see also Hogan*, 458 U.S. at 728 ("[A] gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened.").  Courts have also noted that "Title IX as it applies to athletics is distinct from other anti-discrimination regimes in that it is impossible to determine compliance or to devise a remedy without counting and comparing opportunities with gender explicitly in mind."  *Cohen*, 101 F.3d at 184.  In fact, under the first prong, athletic programs compare "participation opportunities for male and female students" in relation to their respective enrollment.  44 Fed. Reg. 71418 (outlining the Three-Part Test).  And Title IX permits financially strapped institutions to "comply with Title IX by cutting athletic programs" to become substantially proportionate.  *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 830 (10th Cir. 1993).  Moreover, "[i]ntermediate scrutiny does not require that there be no other way to accomplish the objectives."  *Cohen*, 101 F.3d at 184.

Here, although the parties agree that the University was in compliance with Title IX during the 2016–2017 academic year, there is substantial evidence in the record that the

Athletics Program was no longer substantially proportionate in 2018–2019 and thereafter. Thus, like in *Kelley*, *Hogan*, and *Cohen*, the University implemented the Compliance Plan (i.e., a remedial measure) to protect female participation opportunities, which the University had good reason to believe were disproportionally burdened. The record further demonstrates that the Athletics Program had lost millions of dollars due to the Covid-19 pandemic. As explained in *Roberts*, the Athletics Program is permitted to remedy that disproportionate burden by cutting certain athletic programs. Accordingly, the Court finds that the Compliance Plan is substantially related to the University's important objectives.

For these reasons, there is not a fair chance of success on the merits by the Plaintiff at this time, and therefore this factor weighs in favor of not issuing the injunction.

### 3. Balance of Harms

When considering the balance of harms, courts must weigh "the threat to each of the parties' rights and economic interests that would result from either granting or denying the preliminary injunction." *Cenveo Corp.*, 2009 WL 161210, at \*4 (internal quotation marks omitted). The purpose is to "assess the harm the movant would suffer absent an injunction, as well as the harm other interested parties and the public would experience if the injunction issued." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015).

As the Court noted above, Plaintiff is harmed by losing his opportunity to compete as a gymnast at the University. However, issuing an injunction cannot resolve that harm because nothing in the record suggests that, even if the injunction issued, Plaintiff could compete this year.

### 4.   Public Interest

Plaintiff asserts that the public interest favors the preservation of constitutional rights and eradicating gender discrimination.  (Pl.'s Mem. at 33–34.)  However, in the cases cited by Plaintiff where the court found that the public interest weighed in favor of granting the injunction, the court also found that Plaintiff had a likelihood of success on the merits. *See Phelps-Roper v. Nixon*, 545 F.3d 685, 694 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012) (finding plaintiff was likely[4] to prevail on the merits and therefore the "public is served by the preservation of constitutional rights"); *Portz*, 196 F. Supp. 3d at 976, 978 ("Yet because Plaintiffs possess a fair chance of succeeding on the merits of their Title IX claim, the public interest weighs in Plaintiffs favor."); *D.M. by Bao Xiong*, 917 F.3d at 1003 (finding "fair chance" of prevailing on the merits); *Ohlensehlen*, 509 F. Supp. 3d at 1101 (same).[5]

Here, Plaintiff has not met his burden of showing a fair chance of success on the merits.  Instead, the public interest rests with the University.  The University is a public

---

[4]      In *Phelps-Roper*, the plaintiff challenged the validity of a statute, triggering the court to determine whether plaintiff satisfied the more stringent "likely" standard.  545 F.3d at 688, 690.

[5]      Plaintiff also cites two cases from other circuits, *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (affirming a finding of likelihood of success on the merits), and *McLaughlin by McLaughlin v. Bos. Sch. Comm.*, 938 F. Supp. 1001, 1017 (D. Mass. 1996) ("[P]laintiff is therefore likely to succeed on the merits of her equal protection claim."). Although neither circuit has adopted the Eighth Circuit's approach to the likelihood-of-success-on-the-merits factor, distinguishing between a "fair chance" standard and a "likely" standard, both found likelihood of success on the merits and found that the public interest weighed in favor of granting the preliminary injunction.

institution that was created by the Minnesota Territory laws and perpetuated by the Minnesota Constitution. *State v. Chase*, 220 N.W. 951, 953–54 (Minn. 1928). The public interest weighs in favor of the University making good faith decisions to comply with Title IX. *See Portz*, 196 F. Supp. 3d at 978 ("SCSU's decisions about its own self-government must not be disregarded by the Court."). Accordingly, the Court finds that the public interest weighs in favor of denying the preliminary injunction.

### III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for a Preliminary Injunction [Doc. No. 7] is **DENIED**.

Dated: March 1, 2022                         s/ Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge