# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1505
_____

Evan Ng

*Plaintiff - Appellant*

v.

Board of Regents of the University of Minnesota; Mark Coyle, in his official capacity as Director of Athletics for the University of Minnesota; Joan T.A. Gabel, in her official capacity as President of the University of Minnesota

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 18, 2022
Filed: April 5, 2023

_____

Before SMITH, Chief Judge, BENTON and SHEPHERD, Circuit Judges.

_____

SMITH, Chief Judge.

Evan Ng filed suit against the Board of Regents of the University of Minnesota (University) following the elimination of the University's men's gymnastics team. He then sought a preliminary injunction to reinstate the team pending the outcome of the

litigation. The district court[1] denied the motion for the preliminary injunction, finding that Ng's delay in filing for the injunction undermined his claim of irreparable harm and that the other preliminary injunction factors favored the University. Ng appeals the order denying the motion for the preliminary injunction.[2] We affirm.

## I. *Background*

In 2014, the Department of Education's Office for Civil Rights (OCR) began investigating the University's compliance with Title IX, 20 U.S.C. §§ 1681–88, and reported its findings in a 2018 letter. To determine compliance with Title IX, it applied the three-factor test in accordance with 1996 OCR Guidance:

---

[1]The Honorable Susan Richard Nelson, United States District Court for the District of Minnesota.

[2]Additionally, we decline Ng's invitation to take judicial notice of a letter from Board of Regents member, Darrin Rosha (the "Rosha Letter"). Ng attempts to make the letter judicially noticeable by characterizing it as a public record under Minn. Stat. § 13.02, subd. 7. *See Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) ("[W]e may take judicial notice of judicial opinions and public records"). However, we may only "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The contents of the Rosha Letter are not generally known nor determinable from unquestionable sources but argumentative. *See Amer. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 797 (8th Cir. 2009); *see also McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 914 (8th Cir. 2014) ("Judicial notice of another court's opinion takes notice of the existence of the opinion, which is not subject to reasonable dispute over its authenticity, but not of the facts summarized in the opinion." (internal quotation marks omitted)). Ng relies on these argumentative contents in his Reply Brief. Appellant Reply Br. at 1, 18, 22, 25, and 31. Therefore, we decline to judicially notice the Rosha Letter and order the references to the letter in the Reply Brief to be stricken from the record since they were not introduced in the district court. *See United States v. Sykes*, 356 F.3d 863, 865 (8th Cir. 2004).

1. Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

2. Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of that sex; or

3. Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

R. Doc. 29-1, at 5. Compliance with any of these three factors would constitute compliance with Title IX. The OCR relied on the following data in making its determination that the University was compliant:

| Sex | Athletic Participation Opportunities: 2016-2017 | | Full-Time Undergraduate Enrollment: 2016-2017 | |
|---|---|---|---|---|
| Men | 457 | 49.51% | 13,828 | 48.04% |
| Women | 466 | 50.49% | 14,955 | 51.96% |
| Total | 923 | | 28,283 | |

*Id*. at 6. The OCR determined that the school needed 28 more female participation opportunities for strict proportionality, but that the school was substantially proportionate because the average team size was 35.85 female athletes, more than the disparity of 28.

-3-

Six years later, in 2020, the COVID-19 pandemic caused the University financial losses estimated between $45 and $65 million. In response, the University initiated a hiring freeze and furloughed or dismissed certain athletics department employees. By this time, the female undergraduate population had increased significantly relative to the male undergraduate population. This increased the disparity between male and female participation opportunities from 28 to 80, more than double the average team size. The University considered creating a new female athletics team to address the disparity. It ultimately determined that creating a new female athletics team to create substantial proportionality would cost approximately $3.5 million.

Instead, it created a compliance plan, which would cut Men's Indoor Track and Field, Men's Outdoor Track and Field, Men's Tennis, and Men's Gymnastics. The plan also included not filling vacant roster spots left by graduating seniors on women's teams. The plan's purpose was to bring the athletics program into compliance with Title IX and to reduce annual costs by approximately $1.6 million. Upon consideration, the Board voted 7-5 to approve much of the original compliance plan but retain Men's Outdoor Track and Field.

Ng, a male gymnast, enrolled as a student at the University to compete as a scholarship athlete beginning in 2020. On September 10, 2020, prior to his arrival, he learned that the team would be disbanded at the end of the 2020–2021 season. He still chose to attend the University and competed in two gymnastic meets in his first season prior to a shoulder injury. Despite the elimination of the team, he chose to stay at the University and is currently in his third year.

Following the elimination of the team, private parties formed the Friends of Minnesota Men's Gymnastics. This group offered to privately fund the team with a proposed budget of $200,000 a year, or at least fund the team for three years to allow the remaining members to compete during the remaining years of eligibility. The

University rejected both proposals. Since elimination of the gymnastics program, all faculty and staff assigned to the team have left, and fewer than five former male gymnasts remain at the University. It is unclear whether the team would be capable of competing in the 2023-24 season. The University continues to pay their scholarship fees.

On October 19, 2021, Ng filed his initial complaint, alleging sex discrimination in violation of both the Equal Protection Clause of the Fourteenth Amendment and Title IX of the Education Amendments of 1972. 20 U.S.C. §§ 1681–88; 34 C.F.R. §§ 106.1–106.71. On November 8, 2021, Ng moved for a preliminary injunction, seeking a reinstatement of Men's Gymnastics pending a decision on the merits. The district court denied Ng's motion after applying the familiar *Dataphase*[3] factors. Under a *Dataphase* analysis,

> whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Id.* at 114.

Taken in turn, the district court found that Ng could not show irreparable harm because of his delay in filing the preliminary injunction. According to the district court, Ng waited 13 months before filing a motion for a preliminary injunction. Even considering Ng's argument that he was pursuing alternatives to litigation, the district court still found that there was at least a six-month delay. The court found this delay unreasonable. In considering the second factor, the district court acknowledged that

---

[3]*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

-5-

Ng was harmed by not being able to compete, but it noted that "an injunction cannot resolve that harm because nothing in the record suggests that, even if the injunction issued, [Ng] could compete this year." *Ng v. Bd. of Regents of Univ. of Minn.*, No. 21-cv-2404, 2022 WL 602224, at *11 (D. Minn. Mar. 1, 2022).

On the likelihood of success on the merits, the district court considered both Ng's Title IX discrimination claim and his Equal Protection claim. It ruled that the Title IX claim was foreclosed by *Chalenor v. University of North Dakota*, 291 F.3d 1042 (8th Cir. 2002). As to the constitutional claim, the court agreed with the University that the claim was an "impermissible collateral attack on Title IX." *Ng*, 2022 WL 60224, at *9. On the merits of the constitutional claim, the district court found that intermediate scrutiny was the appropriate standard to apply and was met by the University.

Lastly, the district court considered the public interest under the final *Dataphase* factor. It determined that because Ng could not show a fair chance of success on the merits, the public interest favored the University. Further, the court noted that "[t]he public interest weighs in favor of the University making good faith decisions to comply with Title IX." *Id.* at *11. Based on its analysis, the district court denied the preliminary injunction.

## II. *Discussion*

On appeal, Ng contends that the elimination of the men's gymnastics team satisfies the *Dataphase* factors and that the district court erred by denying his preliminary injunction. The University argues that, among other things, Ng unreasonably delayed in filing his motion for a preliminary injunction. This alone is a sufficient basis to deny a preliminary injunction.

"A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." *Turtle Island Foods,*

-6-

*SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (internal quotation marks omitted). "We review the [d]istrict [c]ourt's material factual findings for clear error, its legal conclusions de novo, and the court's equitable judgment—the ultimate decision to grant the injunction—for an abuse of discretion." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 689–90 (8th Cir. 2003). A district court abuses its discretion in the preliminary injunction context "when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment." *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

When determining whether a preliminary injunction should issue, we consider "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase*, 640 F.2d at 114. There is no single factor that is regarded as dispositive; rather, the court should balance all the factors in considering whether the injunction should be granted. *Id.* at 113. However, an unreasonable delay in moving for the injunction can undermine a showing of irreparable harm and "is a sufficient ground to deny a preliminary injunction." *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (internal quotation marks omitted).

"Students who are denied the opportunity to join their schools' sports teams because of their sex may suffer irreparable harm." *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019). A delay may belie the claim of an irreparable injury before trial if it is unreasonable but that depends on the facts of the specific case. *Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 935 (8th Cir. 2002). "To establish the need for a preliminary injunction, the movant must show more than the mere possibility that irreparable harm will occur. A movant must show he is 'likely to suffer irreparable harm in the absence of preliminary relief.'" *Sessler*

-7-

*v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Additionally, "the absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction." *Dataphase*, 640 F.2d at 114 n.9.

This case presents two discrete legal issues: first, whether Ng has suffered irreparable harm, and second, whether he unreasonably delayed in bringing the claim. An instructive case on the first issue is *Ohlensehlen v. University of Iowa*, 509 F. Supp. 3d 1085 (S.D. Iowa 2020), *appeal dismissed*, No. 21-1203, 2021 WL 3174982 (8th Cir. Feb. 26, 2021). There, the University of Iowa decided to eliminate its women's swimming and diving teams. *Id*. at 1088. The court found that the school's elimination of the team caused irreparable harm and rejected arguments that the harm was somehow remedied because the athletes kept their scholarships and were free to transfer before the start of the next season. *Id*. at 1102–03; *see also Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 972–73 (D. Minn. 2016) (holding that the ability to transfer to another school to play women's tennis did not vitiate the movant's showing of irreparable harm).

We agree with these district courts that the irreparable harm of being denied the opportunity to compete in intercollegiate athletics may remain despite the retention of scholarships and the ability to transfer. *See D.M. by Bao Xiong*, 917 F.3d at 1003. "Congress passed Title IX pursuant to its power to enforce the Fourteenth Amendment to combat gender discrimination in education, and the denial of a constitutional right is a cognizable injury and an irreparable harm." *Ohlensehlen*, 509 F. Supp. 3d at 1103 (cleaned up); *see also Elrod v. Burns*, 427 U.S. 347, 373–74 (1976). Ng may be able to show irreparable harm if he is able to show that any delay was reasonable.

We have found that "[d]elay is only significant if the harm has occurred and the parties cannot be returned to the status quo." *McKinney ex rel. NLRB v. S. Bakeries,*

-8-

*LLC*, 786 F.3d 1119, 1125 (8th Cir. 2015) (alternation in original) (quoting *Sharp ex rel. NLRB v. Webco Indus., Inc.*, 225 F.3d 1130, 1136 (10th Cir. 2000)). The mere length of the delay is not determinative of whether the delay was reasonable. Delays of seven months have been held to be reasonable, *Safety-Kleen Sys.*, 301 F.3d at 936, as well as delays of eight months, *McKinney*, 786 F.3d at 1123. Additionally, we have previously concluded that a delay of roughly five months was unreasonable, *see Phyllis Schlafly Revocable Trs.*, 924 F.3d at 1010 n.4, as well as 17 months, *see Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). Likewise, we have found a delay of several years unreasonable. *See Hubbard Feeds Inc .v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir. 1999). Thus, the determination of the reasonableness of a delay is context dependent.

Ng learned that the team would be disbanded on September 10, 2020. He filed his initial complaint in this action on October 29, 2021. He then sought an injunction nearly two months after that in November 2021. This means 13 months elapsed before he filed for an injunction. Ng tries to justify this delay by noting that he "joined the efforts of Coach Burns and the Friends of Minnesota Men's Gymnastics to convince the University to keep the team." Appellant's Br. at 24. There is nothing in the record explaining what he did during this time, aside from joining the club gymnastics team. Ng implies participation in these efforts, but there is nothing in the record to support the claim. Even assuming he did get involved in the campaign, six months still passed before he moved for a preliminary injunction.

The men's collegiate gymnastics season begins in December at the earliest and January at the latest. The goal of a preliminary injunction is "to preserve the status quo until the merits are determined." *Dataphase,* 640 F.2d at 113. Given that the injunction motion was not filed until November 2021 and that the majority of the coaching staff and other gymnasts had left the University by this time, it would have been improbable at best for the team to have competed in the 2021–2022 season. Because Ng sought an injunction after it would have been possible "to preserve the

status quo," *id.*, we hold that the delay was unreasonable and that it consequently defeated Ng's goal of preventing irreparable harm.

Because we hold that the delay was unreasonable, and "an absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction," *id.* at 114 n.9, we need proceed no further in analyzing the *Dataphase* factors.

### III. *Conclusion*

We hold that the district court did not err in denying Ng's motion for a preliminary injunction. Given the context of the collegiate gymnastics season, Ng's delay of at least six months in filing the motion was unreasonable, which undermines his claim of irreparable harm as a basis for injunctive relief. Accordingly, we affirm.

_____